UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| S.W., by and through his Guardian Ad Litem, WANDA WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, <br><br> Defendant. | No. CV 15-3189-PLA <br><br> **MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Wanda Williams ("Williams"), on behalf of S.W. ("plaintiff"),[1] filed this action on April 29, 2015, seeking review of the Commissioner's denial of plaintiff's application for Supplementary Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on July 6, 2015, and May 16, 2016. Pursuant to the Court's Order, the parties filed a Joint Stipulation [alternatively "JS"] on May 9, 2016, that addresses their positions

---

[1] At the time this action was filed, Wanda Williams was appointed Guardian Ad Litem for her minor grandson. [Dkt. No. 10.]

concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## **BACKGROUND**

Plaintiff was born on December 19, 2001. [Administrative Record ("AR") at 94.] On September 28, 2009, Williams filed an application seeking SSI payments on behalf of plaintiff, alleging that he has been disabled since April 2, 2008, due to attention deficit hyperactivity disorder ("ADHD") and bipolar disorder. [AR at 19, 94-97, 98, 102.] After plaintiff's application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR at 19, 77.] A hearing was held on May 24, 2011, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 35-63.] Williams also testified on plaintiff's behalf. [AR at 50-62.] A medical expert ("ME"), pediatric neurologist David T. Huntley, M.D., also testified. [AR at 38-44; see JS at 13.] On August 22, 2011, the ALJ issued a decision concluding that plaintiff was not under a disability since September 28, 2009, the date the application was filed ("2011 Decision"). [AR at 19-30.] Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on December 7, 2012. [AR at 6-10.] Plaintiff filed an action with this Court in case number CV 13-2881-PLA, and on March 19, 2014, this Court remanded the matter. [AR at 529-44.] On December 3, 2014, a remand hearing was held, at which time plaintiff again appeared represented by an attorney and testified on his own behalf. [AR at 454-77.] Williams [AR at 468-76], and Dr. Huntley [AR at 457-67] again testified. [AR at 457-67.] On February 26, 2015, the same ALJ issued a decision again concluding that plaintiff was not under a disability since September 28, 2009, the date the application was filed ("2015 Decision"). [AR at 481-91.] When the Appeals Council denied plaintiff's request for review on December 7, 2012 [AR at 516-20], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

/

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## **THE EVALUATION OF DISABILITY IN A CHILD**

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

## A. THE THREE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a three-step sequential evaluation process in assessing whether a child is disabled. 20 C.F.R. § 416.924. In the first step, the Commissioner must determine whether the child is currently engaged in substantial gainful activity; if so, the child is not disabled and the claim is denied. Id. If the child is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the child has a "severe" impairment or combination of impairments causing more than minimal functional limitations; if not, a finding of nondisability is made and the claim is denied. Id. If the child has a "severe" impairment or combination of impairments, the third and final step requires the Commissioner to determine whether the impairment meets, medically equals, or functionally equals an impairment in the Listing of Impairments ("Listings") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded; if not, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 416.924. In determining whether a child's impairment or combination of impairments functionally equals an impairment in the Listings, the Commissioner must assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(a)-(b). To functionally equal an impairment in the Listings, the child's impairment or combination of impairments must result in a "marked" limitation in two of the domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). By contrast, an "extreme" limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

## B. THE ALJ'S APPLICATION OF THE THREE-STEP PROCESS

In this case, at step one, the ALJ found that plaintiff, a 13-year old boy at the time of the hearing, "has never engaged in any work activity and therefore has not performed substantial

gainful activity." [AR at 485.] At step two, the ALJ concluded that plaintiff has the medically determinable impairment of attention deficit disorder ("ADD"), but that plaintiff's impairment causes no more than minimal functional limitations and, therefore, he does not have an impairment or combination of impairments that is severe. [Id.] As a result, the ALJ concluded at step two that plaintiff is not disabled. [AR at 491.]

## V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he: (1) determined that plaintiff did not meet or medically or functionally equal the Listing of Impairments for Children,[2] and did not follow the Court's remand order (a) to reevaluate the medical evidence regarding plaintiff's alleged impairments, including ADHD, mood disorder, and specific learning disability, and explain his reasons for finding them severe or nonsevere; (b) to "address [plaintiff's] standardized test results in the record and, if he chooses not to rely on any such scores, . . . explain his reasons for doing so"; and (c) if required to interpret plaintiff's standardized test scores in terms of standard deviations, to seek the assistance of an expert to fully develop the records so that he can make such an evaluation[3]; and (2) failed to give proper and sufficient weight to the testimony and third-

---

[2] In fact, because the ALJ found in his 2015 Decision that plaintiff's ADD was not severe, he never proceeded to step three of the analysis. [AR at 484-85.] The Court will consider plaintiff's instant claim to include error in the ALJ's determination that plaintiff's medically determinable impairment of ADD was not severe.

[3] When standardized tests are used as the measure of functional parameters -- the preferred method of documentation if available -- a valid score that is two standard deviations below the norm for the test will be considered a marked restriction. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00C; [see also AR at 483.] In this case, plaintiff's Full Scale IQ score of 83 as determined by consulting examiner Kim Goldman, Psy.D., on November 12, 2009 [AR at 340], is two standard deviations below the norm for the test. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D.9 (noting that the Wechsler series of IQ tests -- including, therefore, the Weschler Intelligence Scale for Children-IV ("WISC-IV") administered to plaintiff [AR at 337, 340] -- have a mean of 100 and a standard deviation of 15). Plaintiff's 2009 IQ scores, which are considered valid only for two years (see 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D10), were valid at the time of the first hearing in May 2011. It does not appear that the WISC-IV, or similar IQ test, was readministered after 2009.

party reports of Williams as directed by the Court in its previous remand order, which instructed the ALJ on remand to credit as true William's statements concerning plaintiff's limitations. [JS at 3.] As set forth below, the Court agrees with plaintiff, and again remands for further proceedings.

**A.    THE ALJ'S DETERMINATION**

In his 2011 Decision, relying in part on the opinions of Dr. Huntley, who confirmed that plaintiff was being treated for the medically determinable mental impairment of attention deficit "hyperactivity disorder . . . [L]isting 112-11 [sic]" [AR at 38], the ALJ determined at step two that plaintiff had the severe impairment of "hyperactivity."[4] [AR at 22.] Based in part on Dr. Huntley's testimony regarding plaintiff's functioning in the relevant domains, the ALJ determined that plaintiff's "hyperactivity" did not meet or equal a Listing and, therefore, plaintiff was not disabled. [AR at 22, 30, 38.] The ALJ also acknowledged in the 2011 Decision that plaintiff was "placed into special education classes in 2008 for deficits in visual processing and attention affecting academic performance," and that "disruptive behavioral problems in the classroom" had been noted. [Id.] The Court agreed with plaintiff that "the ALJ failed to determine whether several of [plaintiff's] alleged impairments, including ADHD, mood disorder, and specific learning disability, were severe." [AR at 543.] The Court also agreed with plaintiff that the ALJ erred in his step three analysis, and ordered him to reevaluate at step three whether plaintiff "meets, or medically or functionally equals in severity, an impairment in the Listings." [Id.]

As detailed in the Court's 2014 Opinion, between 2009 and 2011 "plaintiff was administered various standardized tests, including the California Achievement Test ('CAT'), four administrations of 'District Wide Assessments,' and the 'California Standards Test.'" [AR at 538 (citing AR at 146, 239.] Plaintiff's 2009 CAT scores in "Math" and "Reading" each yielded a "National Percentile Rank" of 2, while his scores in "Science" and "Spelling" each yielded a "National Curve Equivalent" score of 0. [Id.] Based on his 2010 California Standards Test scores

---

[4]    The determination that plaintiff had the medically determinable severe impairment of "hyperactivity" lends even more confusion to the ALJ's ambiguous use of the terms "ADD" and "ADHD" as discussed in more detail herein.

6

in "English-Language Arts" and "Math," plaintiff was assigned a proficiency level of "FBB [Far Below Basic]." [Id. (see also AR at 247).] The Court ordered the ALJ on remand (1) to reevaluate the medical evidence regarding plaintiff's alleged impairments, including ADHD, mood disorder, and specific learning disability, and explain his reasons for finding them severe or nonsevere[5]; (2) to "address [plaintiff's] standardized test results in the record and, if he chooses not to rely on any such scores, . . . explain his reasons for doing so"; and (c) if required to interpret plaintiff's standardized test scores in terms of standard deviations, to seek the assistance of an expert, to fully develop the records so that he can make such an evaluation. [AR at 543-44.] Plaintiff contends that the ALJ failed to properly develop the evidence and to evaluate plaintiff's standardized test scores as directed in the remand order. [JS at 6.]

In the 2015 Decision, although the ALJ found that plaintiff has the medically determinable impairment of ADD, he also found that impairment was not severe and, therefore, it was "not appropriate to proceed to step three of the evaluation process." [AR at 484.] He noted, however, that pursuant to the Court's remand order, he would "provide[] additional explanation and analysis" of his determination. [AR at 485.] Although he determined that plaintiff had the medically determinable impairment of "ADD," the ALJ also inconsistently stated that he found insufficient evidence in the record to support plaintiff's alleged mental conditions of *ADHD* (attention deficit *hyperactivity* disorder), mood disorder, and learning disorder, "as discussed in more detail" within his decision. [AR at 485.] In determining that plaintiff has the medically determinable impairment of "ADD," the ALJ stated that he relied on the opinion of the ME, "and the evidence of record, which reflects a consistent diagnosis of ADD . . . ." [Id.] Indeed, the records specifically show that

---

[5] The ALJ in the 2014 Decision found that plaintiff had the severe impairment of hyperactivity. [AR at 22.] It was *not* the Court's intent on remand to disrupt the ALJ's step two determination that plaintiff's medically determinable impairment of "hyperactivity" was *severe*. Indeed, the Court's remand order involved *step three* evaluations. The ALJ provides no explanation as to why the former step two impairment and determination that it was severe were not again found in the 2015 Decision, especially considering that the same ALJ and the same medical expert were again considering much the same evidence. Indeed, based on the ALJ's questioning of Dr. Huntley at the 2014 hearing (which concentrated on whether or not plaintiff's ADD/ADHD met or equaled a Listing, including whether he had marked limitations in any of the relevant domains), both the ALJ and the ME appeared to consider that the ADHD was severe. [See, e.g., AR at 457-67.]

7

plaintiff was diagnosed with ADHD, Combined Type, i.e., indicating features associated with both inattentiveness and impulsivity/hyperactivity. [See, e.g., AR at 315, 375]; see also Diagnostic and Statistical Manual of Mental Disorders 85-93 (4th ed. 2000) ("DSM-IV"). The ALJ's decision, therefore, is unclear as to whether the ALJ was intentionally making some sort of distinction -- whether or not there actually is one[6] -- between ADD and ADHD. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11. Furthermore, the ALJ never again mentioned plaintiff's alleged mood disorder, and only briefly mentioned plaintiff's "possible" learning disability. [See generally AR at 485-91; see also AR at 486-87 (citing AR at 725) (ALJ noted that plaintiff's Connors' 3 Screening Test results were "reported as indicating possible ADHD [64% probability] and learning disability.").] He did not further discuss why he implicitly found that plaintiff's mood disorder and learning disability were not medically determinable impairments, let alone whether they were severe or non-severe; neither did he discuss any functional limitations that might result from those disorders, or plaintiff's standardized test results and any reasons for not relying on those scores[7]; nor did he seek the assistance of an expert to interpret those scores in terms of standard deviations. Thus, the ALJ did *not* comply with this Court's prior remand order.

Moreover, as noted by plaintiff, the ME's testimony, on which the ALJ relied [AR at 486] is confusing in several ways. [See JS at 9 (citing AR at 457, 459-63) ("the [ME]'s testimony was sketchy, equivocal, superficial and ambiguous . . . [and] [h]e rambled, seemingly seeking an explanation for [plaintiff's] problems").] The ME first testified that plaintiff's evaluation at seven years of age showed that "up to that point, he clearly doesn't meet the Listing, it's non-severe."

---

[6] The DSM-IV does not include "ADD" as a separate disorder. Instead, it categorizes Attention-Deficit/Hyperactivity Disorder according to three subtypes: Predominantly Inattentive, Predominantly Hyperactive-Impulsive, and Combined. DSM-IV 87. In order to meet Listing 112.11, there must be medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity, among other things. 20 C.F.R. pt. 404, subpt. P, App. 1 § 112.11.

[7] See supra note 3; infra note 15.

[AR at 457-58.] He then went on to state the following[8]:

> Now, since that time, you know, we have IEPs [Individual Education Programs] submitted. The trouble with the IEPs is that it [sic] doesn't necessarily where [sic] he stands in reference to his peers, per se. It says what he's doing, what they want him to do and what they expect him to do. . . . It's not really a statistical issue in terms of severity. . . . When I look at what's going on in the classroom it doesn't seem to be that bad. It seems to be, the major problem is opposition. And it seems to be more in the home environment than the school environment. . . . Now that will affect his school environment because the record does show that he just basically doesn't turn in his homework, among other things. And then that becomes an additive issue. When you look at testing on him, . . . his Woodcock Johnson [see AR at 743], he does not retain what he's been shown to do. Whether that's not, whether that's due to inattention or a social issue I can't determine from that. I think the one thing that would, you know, the one thing we have that's quantifiable saying that he does have an impairment (INAUDIBLE), would be . . . his Connors Test. That is a subjective test but it is the standard that's used to gauge things. But apart from that I have, you know, I have a lot of moderate comments about things. . . . So, you know it seems that he has a moderate impairment. It seems that there are social issues here that are confounding his academic performance, but I wouldn't know if they're necessarily due to his ADD. I can't say that, per se. His outcome, obviously, is not, has not been a good one. I mean, we can say that I think with certainty. . . . But I can't, for me to say that it's totally due to a medically determinable Listing, I can't really, I can't find a way to come up with something concrete for that.

[AR at 457-59 (citations omitted).] The following colloquy then occurred:

> [ALJ] Okay. Should we proceed to the Domains or talk about functionally meeting? I just have a hard time between that concept of medically meeting and functionally meeting. But anyway, that's a step we, they lay out for us. [¶ . . . .] It seems like you've covered that because, you know, you're looking at these exhibits where, you know, it's, there's some problems. They could be moderate, but you can't even determine whether or not they're, they stem from a medical impairment. So it seems like we're getting into functionality at that point so.
>
> [ME] And the psychiatrists that are following him aren't quantifying it. I mean, their notes don't say anything. [¶ . . . .] So that's a problem. There, there might be something there but no one's documenting it because they're not thinking Social Security wise. They're just thinking clinic wise. . . . .
>
> [ALJ] So acquiring and using information. How would you assess that?
>
> [ME] Well, from what I see here –
>
> [ALJ] Or is there not enough information for me to –
>
> [ME] There's not enough information. [¶ . . . .] If you look at his Star Testing [AR at 779] and his Woodcock Johnson [AR at 743] you might say that *he's not acquiring, that it's a marked problem.* I mean, if you look at those testing you could say that.

---

[8] Although lengthy, it is necessary to set forth the ME's testimony in relevant part to demonstrate the confusing and ambiguous nature of that testimony.

9

>Why that's happening I can't tell you per se. I, I think there's too much of a social component to it. You know, we have, like I said, we have in here that people don't think it's a significant problem. You know, they guide him and he gets his work done. But that's not the same thing as retaining what you've done or being interested in going to school, you see, so I, you know. [¶ . . . .] I was looking at the medications that he's on. I would, I would put forward that the reason why they've had to raise the dose of medication is that the inattention issue isn't necessarily the main issue. When you have, when you have pure ADD, if you're treated with the medication it fixes the problem, period. . . . You supplement the dopamine and then you are just like everyone else, which is in his case, from his testing, kind of a C minus student. And that's what he's going to perform at is a D plus, C minus. That's, that's what he can do. Now, it's not supposed to make him an A student. It's supposed to get him up to a level where he's getting D pluses and C minuses. If, if he fails to perform with the medication, I would infer it's due to something, some other problem. And that's where the social issue comes in.

[AR at 459-61 (emphasis added).]

Plaintiff's counsel then questioned the ME about plaintiff's functioning on the specific domains:

>[COUNSEL] Okay, so taking the testing information can you say that there is a marked functional limitation in information, use of information? [¶ . . .] So in terms of intellectual functioning or school functioning. In other words we have a math and reading percentile rank of two. [¶ . . .] And we have a zero percentile rank in spelling. And, and far below basic in all the test scores, English, language arts and math.
>
>[ME] So we have to ask ourselves why is he functioning at that level? Is it due to a medically determinable Listing . . . . or is it due to something else? So when I'm looking at that, it's the point of view of that level or retention from his IQ scores cannot be explained. You should be doing better than that with his IQ. . . . So first of all, you know, the fact that we're all born at a certain level of smartness, he should be doing better than that. Okay, so it's not due to mental retardation or a similar process like that that we can't treat. So then it's a question about is it due to motivation or inattention? Okay. And that's where the record is devoid of information to substantiate that.
>
>[COUNSEL] But the end result --
>
>[ME] So let's go through, let's just go through this and I can tell what the testing can say and not say, all right. [¶ . . . ] Okay, so let's go to 13F [plaintiff's school records at AR pp. 695-799] for starters. So we look at his grade equivalent for oral language [AR at 743]. And he's supposed to be at third grade.[9] Fairly close to where he should be. Mathematical skills, third grade, grade equivalent. Another one, find the other one. So we're looking at 71 for academic skills [grade level 3.5]; academic fluency, not so good [at 67, grade level 3.2]. That, that again would suggest

---

[9]  The ME misstated the evidence. The assessment referred to was done on October 14, 2014, when plaintiff was 12 years old and in the *7th* grade. [AR at 724.] His grade equivalent results on the Woodcock Johnson test, which were at the third grade level, were well below his actual grade level.

10

inattention issue, the subsets. You look at the Connors and it didn't show any specific bias, positive or negative. And that does show inattention, okay. So you had a raw score of eight [see AR at 730].[10] He is primarily ADD, impulsive and hyperactive.[11] So, so we have documentation there. I'm just saying this, *this bodes for the client in this one*." I think that's something a little more solid because that's talking about functionality. But again, it's a test that somebody's subjective interpretation of what's going on. It is not a, that is the best we've got. Okay, but that is suggestive. . . . Okay, [assessor's] name, [assessor's] name is, it says psych. So I'm assuming that's a nonfamily member, so that is, I think is valid. [¶ . . .] [S]o that's something that we can, that's fairly solid. And again, like I said, the Woodcock Johnson [AR at 743] just tells you what he's retained from what he's been exposed to. That's all it tells you. And, and kids with ADD will always a (INAUDIBLE) of doing poorly in math for those. That's kind of a given. If you have ADD we expect you to see a, a problem in math. Now, there's an IQ test, where was it. I was a little surprised to see that too. There's just a lot of fodder in here to go through. Let me see. I think that might be page 12, let me see. No, that's not it. I'm trying to find the page, I remember seeing his IQ performance test scores and in subsets for reading and performance and it was consistent with ADD.[12] It wasn't severe. [¶ . . .] That would be October of this year. Okay. So let's, let's just say that *that would probably be a substantial piece of evidence in his favor*, but then backtracking, when did it transform from something that was not substantial to something that is? Okay.

[AR at 462-65 (emphases added).] The ME then reviewed some of plaintiff's "psych notes," and stated that none showed "severe impressions about his inattention," and that "it just smells behavioral to a large extent." [AR at 465.] He again noted that based on the Connors Test and multiple IEPs, plaintiff is "not academically following through [but] [w]hat that is due to I can't tell you." [Id.] He noted that there was no psychiatric note "saying that [plaintiff] clinically medically is inattentive, corresponding to something," and "there's a disproportionate opinion between what the psychiatrist are [sic] noting in their notes and his performance at school." [AR at 466.] He

---

[10] Plaintiff had a raw score of 8 on the scale assessing whether plaintiff's ADHD was predominantly of the hyperactive-impulsive type. [AR at 730.] This raw score was deemed to be an "Average Score (Typical levels of concern)." [Id.] His raw score of 14 on the scale assessing whether his ADHD was predominantly of the inattentive type was deemed to be a "High Average Score (Slightly more concerns than are typically reported)." [Id.]

[11] But see supra note 10 (noting that plaintiff's raw score on the inattentive scale was of more "concern" than his score on the hyperactive-impulsive scale).

[12] The only IQ test scores the Court was able to find in the record were those provided by Dr. Goldman on November 12, 2009. [AR at 336-41.] Plaintiff's WISC-IV scores on Verbal Comprehension, Perceptual Reasoning, and Processing Speed were all found to be "Low Average," as was his Full Scale IQ of 83. [AR at 340.] His Working Memory score was determined to be "Average." [Id.; see also supra note 3.]

went on:

> [B]ut there's, there's a disparity between his behavior and I think that, it was clearer when he was younger, that it was something they could handle when he was younger. Now that he's getting to adolescence maybe not. I mean, there are other factors involved here. And you see that they're starting, and this is something else to note too. When they initially put him on stimulants to control his inattention he didn't really change, there was an improvement with his focus and all that, but when you look at the social issues. You know, refusing to do his homework; spending his time riding his bicycle after school; not obeying his grandmother; having temper tantrums. All those things aren't related to ADD. Those are social issues or mood disorder issues. And then, you know, you see them adding things to treat mood, . . . . If those problems were due to inattention they were fixed. Now, there isn't exactly a Listing for a conduct disorder in the Listings. Okay, you know, he does also have a diagnosis of a conduct disorder. I don't know where I could squeeze that in under a Listing. But you know, there's other things here that are apart from the ADD component. And the only thing I could, that comes close to it is personality disorder and I don't, you know for a conduct disorder I don't, I don't, when you read the requirements for a personality disorder, you know, I wouldn't want to say that's who he is. I mean, so that's the kind of the situation. If there was a Listing for conduct disorder you could make some social arguments that he has that, he meets the Listing. But a conduct disorder is not part of the Listings for Social Security. So he might, *he might have a marked psychiatric impairment*, but I don't have a way to pigeonhole that. [¶ . . . ] *[W]e do have some thing, like I say, now that he's 12, there, like I said, they are severe in that regard.* You could say that the Connors, but that's just one thing. But I don't have any psychiatric stuff, real time, leading up to that.

[AR at 465-67 (emphasis added).]

Of note, like the ALJ, the ME *never specifically addressed plaintiff's learning disability*.[13] Based on plaintiff's school records, on October 29, 2008, the Pomona Unified School District psychologist determined that plaintiff had "low average-average cognitive ability, weak attention, [d]iscrepant reading decoding/comprehension and math calculation/reasoning, written expression due to auditory and visual processing deficits." [AR at 719; see also AR at 151-56.[14]] It was also noted that plaintiff was referred for special education assessment because of "Academic and behavioral concerns." [AR at 151, 265.] It was determined that plaintiff met the eligibility criteria

---

[13] A student has a specific learning disability under the Individuals with Disabilities Education Act ("IDEA") if he or she has "a disorder in [one] or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 20 U.S.C. § 1401(30)(A).

[14] It appears that only every other page of this report was included in the AR. [See AR at 151-56, 265-70.]

12

for special education based on a specific learning disability, due to disorders in visual and auditory processing, and that a severe discrepancy existed between his intellectual ability and his achievement in math calculation, basic reading skills, math reasoning, and reading comprehension. [AR at 723; see also AR at 156, 270.] On October 26, 2011, the School Psychologist found "average cognitive ability. Discrepant reading decoding/comprehension and math calculation/reasoning, due to auditory and visual processing deficits." [AR at 723.] In the October 2014 Conners 3 Assessment Report, the educational specialist noted that plaintiff's teacher reported that plaintiff's "problems seriously affect his functioning **often** . . . in the academic setting." [AR at 725.] The school records also reflect plaintiff's diagnosis of ADHD, Combined Type [see, e.g., AR at 719], as well as behavioral problems. [See AR at 151, 265.]

As discussed above, in determining whether plaintiff's impairments "functionally equal" a Listing (a concept the ALJ noted he had a "hard time" distinguishing from "medically" equaling [see AR at 459]), the ALJ must assess the child's functioning in the six domains, at least three of which may be most relevant here: acquiring and using information; attending and completing tasks; and interacting and relating to others. [See also JS at 20.] A marked impairment in at least two of the domains,[15] or an extreme impairment in one of them, demonstrates an impairment that functionally equals a Listing level of severity.[16] However, because the ALJ did not reevaluate the medical evidence regarding plaintiff's alleged impairments of mood disorder and specific learning disability, he never performed an analysis of their severity, or an evaluation of whether those impairments meet or functionally equal a Listing. Indeed, as previously discussed, the ALJ also inexplicably rejected his previous step two determination in the 2011 Decision that plaintiff has the severe

---

[15] As previously discussed supra, in note 3, plaintiff's 2009 Full Scale IQ score of 83, which is two standard deviations below the norm for the test, is considered a "marked" restriction when standardized tests are used as the measure of functional parameters. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00C.

[16] Plaintiff contends that there is evidence to support a finding that plaintiff meets or equals the Listing "in three diagnostic categories of mental Disorders: mood (112.04), attention deficit hyperactivity disorder (112.11) and organic mental disorder (112.02)." [JS at 21-26 (footnote omitted)].

13

impairment of hyperactivity. Instead, considering only plaintiff's "ADD" -- an ambiguous "label" as discussed herein -- the ALJ found plaintiff's "ADD" to be non-severe. He thereby curtailed his analysis of that impairment at step two.

In light of the ALJ's failure to comply with the Court's remand order to reevaluate the evidence regarding plaintiff's alleged impairments of ADHD, mood disorder, and specific learning disability, and to explain his reasons for finding them severe or nonsevere, as well as his unexplained rejection of his prior step two determination that plaintiff had the medically determinable severe impairment of hyperactivity, remand is warranted.

**B.  LAY WITNESS TESTIMONY**

Plaintiff contends that the ALJ did not provide proper and sufficient weight to the testimony and written statements of Williams, plaintiff's grandmother, and improperly found that her testimony was not consistent. [JS at 26.] Specifically, in the remand order, the Court ordered the ALJ on remand to credit Williams' statements concerning plaintiff's limitations as true. [AR at 543.] Although the ALJ acknowledged this order, he "went on to allege that [Williams'] testimony was inconsistent and that it did not support any functional limitations," or was exaggerated. [JS at 27 (citing AR at 480-81, 490-91).] The ALJ then found that although plaintiff "is not well-behaved when he is at home . . . [he] cannot find [plaintiff] has significant behavior problems at school or that his behavior problems are the result of a medically determinable mental impairment." [AR at 491.] However, as noted by the ALJ, Williams testified that plaintiff "exhibited behavioral problems at school including getting in fights, swearing, refusing to do his work, not sitting still, not paying attention, being disobedient, and talking back." [AR at 488.] The ALJ acknowledged that plaintiff was "exhibiting some behavior problems both at school and at home"[17] [AR at 488], and the records reflect that plaintiff was referred for special education assessment because of "Academic and behavioral concerns." [AR at 151, 265.] Finally, as noted by plaintiff, his school records show

---

[17] In his 2011 Decision, the ALJ also acknowledged that "disruptive behavioral problems in the classroom" had been noted. [AR at 22.]

14

1 the following:

2 > [N]ine separate incidents of defiance, disrespect, disruption, profanity, and cause of physical injury in 2008. (AR 144) In 2010 there were two incidents of causing physical injury to others. (AR 144) School record shows 21 unexcused Tardys in the 3rd grade which included incidents of leaving the classroom. (AR 143.144) Additionally from 9/28/08 through 1/20/11 there were 62 incidents of school office visits for injury, headaches, stomach aches, nausea and vomiting, asthma, fatigue and to change clothes. (AR 144-145) A teacher's disciplinary write-up for August 6, 2008 describes claimant's aggressive and disruptive behavior, lack of discipline, hiding under the table, leaving his desk, hiding in the restroom, leaving the classroom, and disobedience. (AR 159-160)[.]

8 [JS at 25.] Thus, there is ample evidence of plaintiff's behavioral problems in the school setting. Regardless, in discounting Williams' testimony as he did, the ALJ failed to follow the Court's remand order to credit her testimony as true. Remand is warranted on this issue.

11 The Court also notes that the remand order further provided that the ALJ on remand should also consider and discuss the statement in the record attributed to plaintiff's tutor at the YMCA, an individual identified as both a teacher and a child specialist, to the extent that statement is relevant to the disability determination. [AR at 542 (citing AR at 271).] No mention is made in the decision about this statement, including any discussion of reasons the ALJ found, if he did, that the teacher's statement was not relevant to the 2015 Decision. Remand is warranted on this issue.

### VI.
### REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were

properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made.[18] In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, as the ALJ's 2015 Decision is inexplicably inconsistent with his 2011 Decision, and the ALJ on remand failed to comply with the Court's remand order, a new ALJ should be assigned on remand. Second, the ALJ is instructed on remand to credit as true Williams' statements concerning plaintiff's daily activities and his limitations resulting from his alleged impairments, and to consider and discuss the statement attributed to plaintiff's tutor at the YMCA. [See AR at 271.] Plaintiff's counsel shall augment the record with a copy of this statement, if available. Third,

(1) With the assistance of a qualified expert or experts,[19] the newly assigned ALJ on remand shall specifically and clearly reevaluate the record evidence regarding plaintiff's alleged impairments, including (a) ADHD, (b) mood disorder, and (c) specific learning disability, and, for any medically determinable impairment, provide a legally sufficient explanation of his or her reasons for finding it to be severe or nonsevere;

(2) Evaluate at step three whether any medically determinable impairment found at step two[20] meets, or medically or functionally equals in severity, an impairment in the Listings;

---

[18] The Court recognizes that plaintiff has already waited more than seven years for a disability determination. Benecke, 379 F.3d at 595 ("Remanding a disability claim for further proceedings can delay much needed income for claimants who are . . . entitled to benefits, often subjecting them to tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.") (quotation marks and citation omitted).

[19] Given the passage of time, the ALJ should consider whether additional consultative examinations should be ordered.

[20] Nothing in this Order is intended to disturb the ALJ's 2011 step two determination that plaintiff had the severe impairment of "hyperactivity."

16

/

(3) In conducting the step three analysis, the ALJ, shall also address plaintiff's standardized test results in the record and, if the ALJ chooses not to rely on any such scores, shall explain his or her reasons for doing so; and

(4) If required to interpret plaintiff's standardized test scores in terms of standard deviations, the ALJ shall seek the assistance of a qualified expert to assist in interpreting such scores, including relating such scores, along with plaintiff's academic records to the extent applicable, to fully develop the record so that the ALJ can properly make his or her evaluation as to whether plaintiff's medically determinable impairments meet or functionally equal a Listing.

## VII.
## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: June 2, 2016

/s/ Paul L. Abrams
_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE